IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-00339-D

**Arthur Albert,**

              Plaintiff,

v.

**Frank J. Bisignano,** Commissioner of Social Security,[1]

              Defendant.

**Memorandum & Recommendation**

      Plaintiff Arthur Albert challenges an Administrative Law Judge's decision to deny his application for social security income. Albert claims that the ALJ erred in reaching that decision by applying an incorrect legal standard. Both Albert and Defendant Frank Bisignano, Commissioner of Social Security, seek a decision in their favor. D.E. 12, 15.

      After reviewing the parties' arguments, the court has determined that the ALJ erred in her determination. The ALJ failed to offer sound reasons to discredit Albert's psychological symptoms. The undersigned thus recommends that the court grant Albert relief, deny Bisignano relief, and remand the matter to the Commissioner for further consideration.[2]

---

[1] The court substitutes Frank J. Bisignano for former defendant Martin O'Malley. *See* Fed. R. Civ. P 25(d).

[2] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

I.  **Background**

   A.  **Factual**[3]

Albert's medical history includes a stroke in 2015. Tr. at 20. He experienced seizures, but the condition is controlled with medications. *Id*.

Albert has also reported tinnitus and hearing loss, causing difficulty in understanding what people say. Tr. at 21. Audiology testing in 2019 and 2021 found mild to moderate hearing loss in the right ear and moderate to severe hearing loss in the left ear. *Id*. In February 2022, testing revealed excellent word recognition in the right ear, but poor word recognition in the left ear. *Id*. Providers prescribed hearing aids to Albert. *Id*.

Albert has also experienced migraine headaches. Tr. at 25. In February 2019, he sought treatment for migraines with slight nausea and photophobia. Tr. at 26. Albert rated his pain as ten out of ten in intensity. *Id*. Providers prescribed medication. *Id*. He also complained of chronic fatigue. *Id*.

In 2020 and 2021, Albert experienced about one headache each week. *Id*. With medication, they subsided in about an hour. *Id*. He denied experiencing headaches at a 2021 neurology visit. *Id*. And the next year, he reported headaches occurring once every few months. *Id*. His medication remained effective in treating them. *Id*.

Albert complained of cognitive issues following his stroke. He had trouble finding words and sometimes saying nonsensical things. Tr. at 27. He had difficulty remembering things and getting words out. *Id*.

At times, Albert has had an explosive temper and did not like being around lots of people or in a place that was not quiet. *Id*. In May 2019, he told providers that he could be explosive,

---

[3] Because Albert challenges only the ALJ's consideration of his psychological symptoms, the undersigned limits the medical history to those issues.

impulsive, and aggressive. *Id*. A mental status exam showed some confusion but normal speech and goal-directed thought processes. *Id*.

At a neuropsychological evaluation two months later, Albert reported trouble with memory and finding words. *Id*. On exam, he displayed a tangential thought process, attention lapses, some impulsivity, and word-finding difficulty. *Id*. But the provider noted intact memory, normal language comprehension, and normal judgment. *Id*. Testing yielded below average results in attention and executive functioning, but the deficits were mild. *Id*.

One month later, records show that Albert needed redirection and information repeated. Tr. at 664. He had trouble retrieving information. *Id*. Treatment notes reflect he hesitated frequently and had trouble gathering his thoughts. Tr. at 656.

Later that year, Albert sought treatment for alcohol intoxication and dependence. Tr. at 27. He participated in ongoing mental health services. *Id*. Records noted forgetfulness and trouble finding words but good attention and intact impulse control. *Id*. Providers referred Albert to speech therapy to implement memory and attention strategies. *Id*.

State agency psychological consultants found that Albert had moderate limitations in the four broad categories of mental functioning. Tr. at 28. They opined that Albert could understand and remember very short and simple instructions, maintain concentration, persistence, and pace to stay on-task in two-hour intervals, interact appropriately with others, and perform simple, routine, repetitive tasks in an environment with low stress and low interpersonal demands. Tr. at 28–29.

In July 2023, Samantha Britt, MA, and E.J. Burgess, Psy.D., performed a consultative psychological evaluation. Tr. at 29. They determined that Albert would have marked limitations in following complex instructions, sustaining attention to perform simple, repetitive tasks, performing tasks at an appropriate pace, and tolerating the pressure of daily work. *Id*. These

3

examiners also found that he was moderately limited in understanding, retaining, and following simple instructions, making work-related decisions, and interacting with coworkers. *Id*.

Albert testified that he stopped working in 2019 because he could not remember what he was doing. Tr. at 25. It took him four times longer than it should to do things. *Id*. Albert's medications make him drowsy, and he naps at unpredictable intervals. *Id*.

### B. Procedural

In January 2023, Albert protectively applied for disability benefits alleging a disability that began four years earlier. After the Social Security Administration denied his claim at the initial level and upon reconsideration, Albert appeared for a hearing before an ALJ to determine whether he was entitled to benefits. The ALJ determined Albert had no right to benefits because he was not disabled. Tr. at 17–32.

The ALJ found that Albert lived with several severe impairments. Among these were chronic back pain impairment, osteoarthritis of the knees, migraines, chronic fatigue syndrome (CFS), post-traumatic stress disorder (PTSD), and alcohol abuse disorder. Tr. at 20. The ALJ also found that Albert's impairments, either alone or in combination, did not meet or equal a Listing impairment. Tr. at 21.

Next, the ALJ determined that Albert had the residual functional capacity (RFC) to perform light work with other limitations. Tr. at 24. He could frequently climb ramps and stairs but could never climb ladders, ropes, or scaffolds. *Id*. Albert could frequently, but not constantly, reach overhead with the upper left extremity. *Id*. And he could frequently, but not constantly, handle and finger with his right hand. *Id*.

4

Albert must avoid concentrated exposure to hazards, vibrating tools and surfaces, and greater than moderate noise levels, as defined in the Selected Characteristics of Occupations (SCO). *Id*.

He can understand, remember, and carry out instructions for simple, routine tasks not subject to specific production requirements, such as assembly line work. *Id*. Albert can maintain concentration, persistence, and pace for two-hour segments for completion of such tasks (assuming normal 15-minute breaks in the morning and afternoon and a 30-minute lunch break). *Id*. He can interact frequently with supervisors, occasionally with coworkers, and have incidental contact with the public. *Id*. And Albert has the ability to adapt to workplace changes involving simple, work-related decisions. *Id*.

Then the ALJ concluded that Albert could not perform his past work as a carpenter. Tr. at 30. But considering his age, education, work experience, and RFC, the ALJ found that other jobs existed in significant numbers in the national economy that Albert could perform. Tr. at 31. These jobs included hand brander, deli worker, and mail clerk. *Id*. These findings led the ALJ to conclude that Albert was not disabled. Tr. at 32.

After the Appeals Council denied review, Albert commenced this action in June 2024. D.E. 1. Both parties ask the court to issue a decision in their favor. 12, 15.

**II.     Analysis**

Albert persuasively argues that the ALJ failed to properly consider his psychological symptoms. It is uncertain whether the ALJ required him to substantiate his mental health symptoms with objective evidence. But the ALJ's decision discloses no appropriate explanation to disbelieve Albert's claims about his mental health impairments and the limitations they caused. So this issue requires further consideration.

5

A.  **Standard for Review of the Commissioner's Final Decision**

When a claimant appeals the Commissioner's final decision, the district court considers whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

B.  **Standard for Evaluating Disability**

Under the Social Security Act, a claimant is disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs use a five-step, sequential process when considering disability claims. 20 C.F.R. § 404.1520.

First, at step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If so, the claim is denied. *Id.*

Then, at step two, the ALJ looks at whether the claimant has a severe impairment or combination of impairments that significantly limit him from performing basic work activities. *Id.* § 404.1520(a)(4)(ii). If not, the claim is denied. *Id.*

Next, at step three, the ALJ compares the claimant's impairments to those in the Listing of Impairments. *Id.* § 404.1520(a)(4)(iii). If the impairment appears in the Listing or if it is equal to a listed impairment, the ALJ must find that the claimant is disabled. *Id.*

But if the ALJ concludes that a presumption of disability is not warranted, the ALJ must then assess the claimant's residual functional capacity ("RFC"). A claimant's RFC "is the most work-related activity the claimant can do despite all of her medically determinable impairments and the limitations they cause." *Arakas* v. *Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020). Determining the RFC requires the ALJ to "first identify the claimant's 'functional limitations or restrictions' and assess the claimant's 'ability to do sustained work-related' activities 'on a regular and continuing basis'—i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule.'" *Id.* (quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)). The ALJ will then "express the claimant's Residual Functional Capacity 'in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy.'" *Id.* (alteration in original).

After assessing the claimant's RFC, the ALJ, at step four, considers whether the claimant can perform his past work despite his impairments. *Id.* § 404.1520(a)(4)(iv). If the claimant can, the ALJ will deny the claim. *Id.* If the claimant cannot, the analysis moves on to step five.

This final step considers whether the claimant, based on his age, work experience, and RFC, can perform other substantial gainful work. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled; if so, they are considered disabled. *Id*.

The burden of proof shifts between the Commissioner and the claimant during the evaluation process. The claimant has the burden of proof on the first four steps, but the Commissioner bears it on the last one. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C. Psychological Symptoms

Albert argues that the ALJ erred in evaluating his conditions by requiring him to substantiate his non-exertional limitations with objective evidence. The Commissioner contends the ALJ properly considered all the evidence in evaluating his mental health symptoms. The

7

undersigned finds that the ALJ failed to adequately explain why his psychological symptoms were discounted. This issue requires further consideration upon remand.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016); 20 C.F.R. § 404.1529. First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain. 2016 WL 1119029, at *3; § 404.1529(b).

If the claimant clears this threshold, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine how much they limit the claimant's ability to work. *Id.* In making that determination, the ALJ considers the "entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id*. at *4.

The ALJ has full discretion to weigh the subjective statements with the objective medical evidence and other matters of record. *Craig* v. *Chater*, 76 F.3d 585, 595 (4th Cir. 1996) (holding that claimant's allegations of pain need not be accepted to extent that they conflict with the record). In a district court's review, the ALJ's findings are entitled to great weight because of the ALJ's ability to observe and evaluate testimony firsthand. *Shively*, 739 F.2d at 989–90.

No objective evidence is required in assessing the alleged symptoms at the second step. *Oakes* v. *Kijakazi*, 70 F.4th 207, 215 (4th Cir. 2023) (citing *Arakas*, 983 F.3d at 95). Instead, "a claimant is entitled to 'rely exclusively on subjective evidence to prove that [his] symptoms [are] so continuous and/or severe that they prevented [him] from working[.]'" *Id.* (citing *Arakas*, 983 F.3d at 96); *see also Shelley C.* v. *Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 360 (4th Cir. 2023)

(error to discount subjective statements based on objective medical evidence, or a lack of it, where condition may not produce such evidence); *Clifford E.* v. *O'Malley*, No. 1:23-CV-704-LPA, 2024 WL 3105669, at *10 (M.D.N.C. June 24, 2024) (ALJ cannot "requir[e] claimants to provide medical evidence that would be impossible to produce given their specific medical conditions.") (citation omitted).

But the ALJ does not have to accept the claimant's statements at face value. *Hawley* v. *Colvin*, No. 5:12-CV-260-FL, 2013 WL 6184954, at *15 (E.D.N.C. Nov. 14, 2013). The ALJ must balance the record evidence, mindful that "inconsistencies in the objective medical evidence is one of the many factors" to consider in evaluating an individual's symptoms. SSR 16-3p, 2016 WL 1119029, at *5.

So although "contradictory evidence may discredit [claimant's] subjective statements . . . a mere absence of medical evidence should not." *Minchew* v. *Kijakazi*, No. 5:22-CV-214-FL, 2023 WL 5919333, at *8 (E.D.N.C. Aug. 21, 2023), *adopted by* 2023 WL 5916528 (E.D.N.C. Sept. 11, 2023); *see William J.* v. *Kijakazi*, Civ. No. 22-2962-BAH, 2023 WL 6518118, at *5 (D. Md. Oct. 5, 2023) ("[W]hile a claimant cannot be required to prove the extent and severity of their subjective complaints with objective evidence, such evidence—if it exists—may still be considered by the ALJ to evaluate those complaints.").

Here, the ALJ found Albert's impairments may reasonably cause the symptoms he alleged. Tr. at 25. But the evidence did not fully support Albert's statements about "the intensity, persistence and limiting effects of these symptoms[.]" *Id*.

Albert claims that the ALJ erred in evaluating his mental health symptoms. The record showed that Albert complained of cognitive difficulties following his stroke. In July 2019, he reported confusion when working long hours and lapses in attention that required redirection. He

also had memory loss and trouble finding words. Neuropsychiatric testing revealed a decline in cognition.

A month later, Albert again noted that he required redirection and information repeated. He also had mild to moderate difficulty retrieving information. Records from October show that Albert was distractible and lost his train of thought. And by December he had trouble following conversations. In October 2020, Albert again reported poor memory and difficulty finding words. He told providers that he no longer cooked or drove alone.

At a July 2023 consultative examination, examiners noted deficits in Albert's auditory memory and that he did not understand what was being asked. They also found serious limitations in Albert's ability to tolerate stress, sustain attention for simple, repetitive tasks, and perform tasks at an adequate pace.

The ALJ found the consultative examination unpersuasive. Tr. at 29. She noted that the records during period at issue did not support the findings of the consultative examination, which occurred six months after the relevant period. *Id*. She also concluded that the examiners' based their findings on Albert's subject statements. *Id*. The ALJ pointed to generally mild mental status exam findings and routine mental health treatment to conclude that Albert was not as limited as he alleged. *Id*.

Albert maintains that the ALJ's decision suggests that he must substantiate his symptoms with abnormal mental status examination findings. Such a requirement conflicts with controlling case law.

The Commissioner contends that evidence supports the ALJ's reasons for finding the July 2023 consultative examiners' conclusions unpersuasive. And he asserts that the record backs the

ALJ's assessment of Albert's subjective statements, without requiring that he corroborate them with objective evidence.

The undersigned cannot conclude that the ALJ required Albert to corroborate his psychological symptoms with objective evidence. But the records disclose no sound reasons offered by the ALJ for finding that his statements were not fully consistent with the record.

The Commissioner maintains that Albert's conditions are distinguishable from impairments that produce no objective evidence.[4] But the record includes objective evidence of the symptoms Albert claimed. Although mild, testing revealed below-average performance in attention and executive functioning. Tr. at 22–23. And treatment notes reflect some impulsivity, trouble with word-finding, and frequent lapses in attention. *Id*.

Bisignano points to the ALJ's observation that Albert had routine mental health care and experienced mild symptoms. Yet an ALJ may not find a claimant's alleged symptoms inconsistent with the evidence based on the frequency or extent of treatment without considering possible reasons he may not comply with or seek treatment consistent with the degree of his complaints, SSR 16-3p, 2017 WL 5180304, at *9. Here, the ALJ's decision reveals no exploration of the reasons Albert may not have sought more care. Nor is it clear what additional treatment providers recommended for his symptoms that he should have followed. So pursuing a usual course of mental health treatment provides no reasonable basis to discount Albert's allegations.

And the undersigned cannot agree with the ALJ's characterization of Albert's symptoms as mild. At times, Albert was alert and oriented and displayed intact memory, good attention, and

---

[4] Bisignano maintains that strokes are diagnosed through objective medical findings, which guides their treatment. Supp. Mem. at 10 n.3, D.E. 15. But this is a different proposition than assessing the residual effects of a stroke, which Albert claims to suffer. And the court need not determine whether the residual effects of a stroke are capable of objective assessment.

normal speech and language comprehension. But at other times, findings showed forgetfulness, trouble concentrating, difficulty finding words, some impulsivity, frequent lapses in attention, and tangential and circumstantial thought processes. And Albert consistently complained of impulsivity and difficulty with memory, finding words, and communicating his thoughts clearly.

What's more, several of the mild or generally benign findings on mental status examinations have questionable connection to Albert's allegations of trouble with communication, attention, memory, and persistence. References to good or anxious moods, frustrated or cooperative attitudes, appropriate eye contact, and normal dress and grooming bear little relevance to the psychological symptoms he experienced. *Arakas*, 983 F.3d at 97–98 (some objective tests may have no relevance to the severity, persistence, or limiting effects of a claimant's condition). So citing generally normal mental status examination findings fails to reflect the longitudinal record of Albert's psychological symptoms and how his limitations manifested.

The ALJ also discounted the consultative examination, in part, because it occurred six months after the relevant period. But Albert's report of symptoms at the consultative examination tracked his experiences during the period at issue before the ALJ. Albert's mental health impairments had been present for several years before his application. And the record reflects no evidence of exacerbation in the intervening period.

So it would appear that Albert's presentation in July 2023 consultative evaluation is consistent with, and potentially relates back to, the relevant period. *See Parker* v. *Berryhill*, 733 F. App'x 684, 687 (4th Cir. 2018) (noting evidence after a claimant's last insured date may warrant consideration if it offers some insight into a claimant's functional ability during the relevant period). The report notes that deficits and diagnoses found in 2018 matched his presentation in the

2023 evaluation. Tr. at 1000. Arguably, then, the consultative examiners' report may relate to Albert functional abilities and limitations during the relevant period.

To the extent that the ALJ concluded the consultative examiners' findings were based on Albert's subjective statements, this explanation, too, does not withstand scrutiny. The consultative examiners conducted a comprehensive clinical psychological evaluation. Tr. at 997. Such evaluations "necessarily include consideration of patient's subjective reports and symptoms." *Tooker* v. *Kijakazi*, No. CV 0:20-3966-PJG, 2022 WL 391576, at *5 (D.S.C. Feb. 9, 2022). Given the subjective component of psychological examinations, it may be improper to discount an opinion because the examiner relied on the claimant's subjective reports. *Id*. (citing *Hare* v. *Astrue*, No. 7:08-CV-36-FL, 2009 WL 873993, at *3 (E.D.N.C. Mar. 24, 2009) ("On one level, plaintiff is obviously correct that a psychiatrist must base his or her findings on the subjective reports of a patient. Psychology and psychiatry necessarily rely on such subjective reports because the types of disorders they deal with are not usually susceptible to direct physical observation as in other medical arenas").

The consultative examination included an interview discussing Albert's history, symptoms, and treatment. Tr. at 997–98. That component of the evaluation is subjective by nature. The providers also conducted a mental status examination. Tr. at 999–1000. Such assessments are not solely subjective as they "contain the objective observations and testing results of mental health professionals" *Vaughan* v. *Kijakazi*, No. 1:21-CV-1, 2022 WL 604257, at *11 (M.D.N.C. Mar. 1, 2022), *adopted by* 2022 WL 981181 (Mar. 31, 2022); *see also Long* v. *Kijakazi*, No. 7:21-CV-176-FL, 2023 WL 2338027, at *4 (E.D.N.C. Jan. 10, 2023) (noting some mental health symptoms are not wholly subjective "and can be validated by the objective observations associated with a mental status examination."), *adopted by* 2023 WL 2333887 (E.D.N.C. Mar. 2, 2023); Paula T.

13

Trzepacz and Robert W. Baker, *The Psychiatric Mental Status Examination*, 3–4 (Oxford Univ. Press 1993) ("Like the physical examination, the Mental Status Examination is termed the objective portion of the patient evaluation.").

The 2023 consultive examination set forth the details of the mental status examination's findings. Tr. at 999–1000. Their conclusions provide objective evidence supporting the examiners' opinions about the limitations Albert may experience. Tr. at 1000–01. The undersigned thus cannot agree with the ALJ's determination that the consultive examiners relied primarily on Albert's reports of symptoms. Tr. at 29. By extension, deeming the consultative examiners' opinion unpersuasive for its reliance on Albert's statements is flawed.

So the undersigned cannot find that the ALJ offered a reasonable basis to discount the consultative examiners' conclusions.

In sum, there is evidence in the record that supports the limiting nature of Albert's psychological symptoms. The ALJ's decision failed to offer tenable reasons to discount those symptoms. And the ALJ does not specify what evidence disproves or undermines Albert's reports of impaired memory, difficulty following conversation, impaired concentration. This error, in turn, has the potential to taint the RFC determination.

Lacking a well-reasoned basis explaining why Albert's statements conflicted with the evidence, the court cannot find that substantial evidence supports the ALJ's decision. So this issue warrants remand.

### III. Conclusion

For these reasons, the undersigned recommends that the court grant Albert's request for relief (D.E. 12), deny Bisignano's request for relief (D.E. 15), and remand this matter to the Commissioner for further consideration.

The Clerk of Court must serve a copy of this Memorandum and Recommendation (M&R) on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated: May 13, 2025

_Robert T. Numbers II_
Robert T. Numbers, II
United States Magistrate Judge